UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
TYREEK SHUFORD,

                              Plaintiff,                    <u>MEMORANDUM & ORDER</u>

                      -against-                   No. 17-CV-6349-JRC

AKEEM CARDOZA and PHANES NERVIL,

                         Defendants,

                      -against-

CITY OF NEW YORK,

                        Cross-Defendant.
----------------------------------------------------------------------x

JAMES R. CHO, United States Magistrate Judge:

       On November 2, 2017, plaintiff Tyreek Shuford ("plaintiff") commenced this action

pursuant to 42 U.S.C. § 1983 against defendants the City of New York ("City"), New York City

Department of Correction ("DOC"), Correctional Officer Akeem Cardoza ("Cardoza") and

Correctional Officer Phanes Nervil ("Nervil").  Plaintiff alleged that Cardoza and Nervil

(collectively referred to as "defendants") subjected him to excessive force in violation of his civil

rights while he was in the custody of the DOC.  *See* Compl., Dkt. 1.[1]  The case was tried before a

jury from March 29, 2022 through April 1, 2022.[2]  The jury returned a verdict finding defendants

Cardoza and Nervil each liable for $250,000 in compensatory damages and imposed punitive

---

[1] Plaintiff voluntarily dismissed his claims against the City and DOC, on consent.  *See* Dkts. 13, 37.  Nervil and Cardoza have asserted crossclaims against the City for indemnification.  *See* Amended Answer and Crossclaims, Dkt. 38.

[2] Plaintiff and defendants consented to the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).  *See* Consent to Jurisdiction by U.S. Magistrate Judge, Dkt. 93.

damages of $500,000 against each of them, for a total verdict of $500,000 in compensatory

damages and $1,000,000 in punitive damages.  *See* Verdict Sheet, Dkt. 113; Judgment, Dkt. 115.

Currently before the Court are defendants' motions for remittitur of the damages award,

or, in the alternative, for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure.

*See* Nervil's Motion to Set Aside Verdict, Dkt. 132; Cardoza's Motion to Set Aside Verdict, Dkt.

133.  As set forth below, the Court grants defendants' motions for remittitur.

### Relevant Trial Testimony

In the course of the trial, the parties provided conflicting accounts of the incident giving

rise to plaintiff's claims.  The following is a summary of the relevant trial testimony.

The altercation involving plaintiff and defendants occurred on October 13, 2015.  *See*

Trial Transcript ("Tr.") at 45, 359.  At the time, plaintiff, then 26 years old, was an inmate

housed at Rikers Island.  *Id.* at 359.  Plaintiff was approximately 6 feet tall and weighed between

130 and 140 pounds.  *Id.* at 362, 509.

That day, Cardoza was assigned to plaintiff's housing unit.  *Id.* at 45.  During the shift,

plaintiff argued with Cardoza[3] because Cardoza had not responded to plaintiff's requests to refill

a hot water maker.  *Id.* at 378-87.  At some point, Cardoza then ordered plaintiff to accompany

him into a vestibule, behind a locked door off the housing unit.  *Id.* at 377-88.  Once in the

vestibule, Cardoza ordered plaintiff, who had his right arm in a hard cast, to stand against the

wall, which plaintiff did after placing the cup he was carrying on the floor.  *Id.* at 55-56, 87, 109,

110-11,  266, 390.  Almost immediately thereafter, Cardoza punched plaintiff in the face and

placed plaintiff in a headlock.  *Id.* at 395.  Hearing the commotion, Nervil then entered the

---

[3] Cardoza testified that, at the time of the incident, he stood approximately six feet tall and
weighed approximately 300 pounds.  Tr. at 52, 267.

vestibule and pulled plaintiff's legs out from under him, taking plaintiff to the floor. *Id.* at 303-06, 316, 395-96, 398. Nervil subsequently kicked and punched plaintiff several times. *Id.* at 305-06, 307-08, 396, 398, 399-400. Cardoza then administered pepper spray in the area near plaintiff's eyes, at which time the altercation ended. *Id.* at 61, 62, 77, 89, 204, 400. A group of inmates watched the altercation through windows by the vestibule. *Id.* at 159-61.

Cardoza testified that he ordered plaintiff into the vestibule because plaintiff had threatened him, and plaintiff was attempting to incite a riot among the inmates. *Id.* at 50, 81, 158, 209, 231-32, 235, 238, 255. Plaintiff had been cursing at Cardoza and challenging him to fight. *Id.* at 197, 208-09, 230, 232, 235, 254. As they approached the door to the vestibule, plaintiff again verbally threatened Cardoza. *Id.* at 209, 210, 237. Once inside the vestibule, plaintiff put down the cup in his hand and spit at Cardoza. *Id.* at 56, 111, 112, 113, 201, 206-07, 210, 211, 237. In response, Cardoza admittedly swung at plaintiff with his right hand. *Id.* at 56, 116, 206-07, 211, 237. Cardoza then grabbed plaintiff around his upper body and two other correction officers entered the vestibule to assist Cardoza -- Nervil and Officer Lattimore.[4] *Id.* at 58, 102, 123, 171. Plaintiff responded by throwing his own punch at Cardoza, with his casted right hand, which landed on the left side of Cardoza's head. *Id.* at 57, 171, 206-07, 215, 237-38. Nervil helped Cardoza bring plaintiff to the ground and Nervil punched and kicked plaintiff several times. *Id.* at 58-59, 118-20, 124-26. Plaintiff continued to punch and kick at the officers while on the ground. *Id.* at 203. In response, Cardoza used pepper spray near plaintiff's eyes. *Id.* at 62-63, 174, 177-78.

Nervil testified that while he was at his duty station adjacent to the vestibule, he heard a commotion and turned to see plaintiff and Cardoza fighting. *Id.* at 301, 312, 323. Nervil and

---

[4] Officer Lattimore is not a defendant in this action.

3

Officer Lattimore responded immediately, and Nervil attempted to grab plaintiff by his upper body. *Id.* at 302-04. When Nervil was unable to hold plaintiff by his upper body, Nervil grabbed plaintiff by the legs and brought him down to the ground. *Id.* at 305-06, 316. Because plaintiff continued to struggle, including punching and kicking at the officers, Nervil admittedly punched and kicked plaintiff several times. *Id.* at 305-07, 316, 318-21.

Plaintiff testified that while in the housing unit, he complained to Cardoza about the lack of water in the hot water maker. *Id.* at 385. At some point in time, the two began to insult and threaten each other. *Id.* at 386-87. Cardoza then ordered plaintiff into the vestibule. *Id.* at 388. Plaintiff denied spitting at Cardoza and testified that Cardoza punched him, without provocation, immediately after the two had entered the vestibule. *Id.* at 395, 459. Cardoza then put plaintiff in a headlock and started choking him. *Id.* at 395. While still in Cardoza's headlock, Nervil entered the vestibule and started punching plaintiff. *Id.* at 395-96, 397-98. Plaintiff sustained blows to his head and body. *Id.* at 398. Nervil then pulled plaintiff's legs out from under him. *Id.* at 398. Once plaintiff was on the ground, Nervil kicked him repeatedly. *Id.* at 398-99. Eventually, Cardoza used pepper spray on plaintiff's eyes. *Id.* at 400.

Plaintiff further testified that because his broken right hand was in a cast, he was unable to form a fist or punch anyone with that hand. *Id.* at 393-94. Plaintiff tried to cover his body during the struggle and pleaded with the officers to stop. *Id.* at 399, 402. As a result of the assault, plaintiff sustained injuries to his nose, ears, lower back, torso and right hand; plaintiff's injuries appear in photographs taken by DOC personnel the day after the incident. *Id.* at 403-04, 414-21, 551-52. Plaintiff testified that he felt humiliated after being beaten in front of other inmates. *Id.* at 432, 466. In addition, after the incident, plaintiff testified that he isolates himself and has problems trusting others. *Id.* at 404-05; *see id.* at 467, 480. Plaintiff acknowledged that

4

he has been assaulted by inmates both before and after the incident at issue, and had been assaulted by correction officers in the past.  *Id.* at 363, 371.

The jury watched three videos depicting the incident from different angles.  However, in each of the three videos, the camera's view of the actual physical altercation was obstructed by the door and wall connecting the housing area to the vestibule.  The parties also admitted into evidence use of force reports prepared by each defendant, as well as portions of plaintiff's medical records from August 2015 to February 2016.  Each defendant acknowledged that the use of force report that he prepared about the subject incident was inaccurate in some respects.  *See id.* at 87-93, 101, 265, 324, 330-31.

## Discussion

### I.      Applicable Legal Principles

Under Rule 59, a court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  Fed. R. Civ. P. 59(a)(1)(A).  Whether to grant a new trial under Rule 59 "'is committed to the sound discretion of the trial judge.'"  *Jennings v. Yurkiw*, No. 14-CV-6377, 2018 WL 5630454, at *5 (E.D.N.Y. Oct. 31, 2018) (quoting *Crews v. Cnty. of Nassau*, 149 F. Supp. 3d 287, 292 (E.D.N.Y. 2015)), *aff'd*, 18 F.4th 383 (2d Cir. 2021).  "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice, *i.e.*, it must view the jury's verdict as against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 245 (2d Cir. 2003) (internal citations and quotation marks omitted); *see also ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 324 (2d Cir. 2022); *Christensen v. Cnty. of Dutchess, N.Y.*, 548 F. App'x 651, 653 (2d Cir. 2013); *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-18 (2d Cir. 2012).  Such a motion should be granted only

"when the jury's verdict is egregious." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).

With respect to the award of damages, the court's discretion to grant a new trial "includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *see also Crews*, 149 F. Supp. 3d at 293. "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984); *see also Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990). "When a trial court finds a damage verdict to be excessive, it may order a new trial on all issues or only on the question of damages." *Magalios v. Peralta*, No. 19-CV-6188, 2022 WL 407403, at *2 (S.D.N.Y. Feb. 10, 2022) (internal citations and quotation marks omitted).

Generally, the Court may order remittitur in two circumstances:  (1) where the court identifies an error that causes the jury to improperly include in the verdict a quantifiable amount; or (2) there is no particular error, but the award is "intrinsically excessive" in that it is "greater than the amount a reasonable jury could have awarded." *Lin*, 742 F.2d at 49.  In the latter event, a jury's damage award may not be set aside as excessive unless "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Dancy v. McGinley*, 843 F.3d 93, 113 (2d Cir. 2016) (quoting *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003)); *see also Wheatley v. Ford*, 679 F.2d 1037, 1039 (2d Cir. 1982).  To determine whether a jury's award is excessive, courts often review the awards approved in similar cases.  *See DiSorbo*, 343 F.3d at 183; *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997); *Saleh v. Pretty Girl, Inc.*, No. 09-CV-1769, 2022 WL 4078150, at *8 (E.D.N.Y. Sept. 6, 2022); *Jennings*, 2018 WL 5630454, at *13; *see also Ismail v.*

*Cohen*, 899 F.2d 183, 186 (2d Cir. 1990).  "Where remittitur is appropriate to correct a damage award deemed excessive, 'the court should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive.'"  *Saleh*, 2022 WL 4078150, at \*8 (quoting *Jennings*, 2018 WL 5630454, at \*13); *see also Rangolan v. Cnty. of Nassau*, 370 F.3d 239, 244 (2d Cir. 2004); *Earl*, 917 F.2d at 1328.

On a Rule 59 motion, unlike a motion for judgment as a matter of law, the court may weigh the evidence itself, rather than viewing the evidence in the light most favorable to the non-moving party.  *See DLC*, 163 F.3d at 134; *Scherer v. Kane*, 284 F. App'x 850, 854 (2d Cir. 2008).  Nevertheless, "it is a disfavored practice in this Circuit to upset a jury verdict that was based largely on the jury's credibility determinations." *Jennings*, 2018 WL 5630454, at \*5; *see also Raedle*, 670 F.3d at 418 ("[W]here the resolution of the issues depended on assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial.") (internal quotation marks and citation omitted); *DLC*, 163 F.3d at 134 (court should "rarely disturb a jury's evaluation of a witness's credibility").  Courts afford a "high degree of deference . . . to the jury's evaluation of witness credibility."  *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97-98 (2d Cir. 2014) (internal citation and quotation marks omitted).  Where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle*, 670 F.3d at 418-19.  The "calculation of damages is the province of the jury," and a court may "not vacate or reduce a jury award merely because [it] would have granted a lesser amount of damages."  *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (internal quotation marks and citation omitted).

7

## II.     Motions for New Trial

Cardoza and Nervil filed separate motions under Rule 59.  Although Cardoza did not submit a separate memorandum of law or cite any cases in support of his arguments, he incorporates the briefs submitted by Nervil.  *See* Declaration [of Leslie H. Ben-Zvi] in Support of Motion for Order of Remittitur or for a New Trial Pursuant to F.R.C.P. 59 ("Ben-Zvi Decl."), Dkt. 133 at 2; Cardoza's Reply Declaration in Support of Motion for Order of Remittitur or for a New Trial Pursuant to F.R.C.P. 59 ("Ben-Zvi Reply Decl."), Dkt. 140 at 1.

### A.     Elements of Excessive Force Claim

While defendants primarily challenge the jury's damages award (and Nervil only seeks a new trial on damages), Cardoza argues that plaintiff failed to present sufficient evidence to establish that Cardoza had deprived him of a constitutional right.  *See* Ben-Zvi Decl. at 2-3. Cardoza further argues that plaintiff failed to establish that Cardoza's actions caused plaintiff's injuries.  *See id*.  The Court addresses Cardoza's liability arguments.

To establish a claim under section 1983, a plaintiff must demonstrate the following three elements by a preponderance of the evidence:  (1) defendant acted under color of state law; (2) defendant deprived plaintiff of his constitutional rights; and (3) defendant's acts were the proximate cause of plaintiff's injuries.  *See West v. Atkins*, 487 U.S. 42, 48, 49 (1988); *Anderson v. Cnty. of Nassau*, No. 15-CV-5351, 2018 WL 1597399, at *8 (E.D.N.Y. Mar. 31, 2018).

#### 1.     Unreasonable Use of Force

To prevail on a section 1983 claim of excessive force, a plaintiff must show that the defendant used physical force against him that was objectively unreasonable under the circumstances.  *See Dancy*, 843 F.3d at 116 (citing *Graham v. Connor*, 490 U.S. 386, 395-96 (1989)); *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 430-31 (S.D.N.Y. 2012).  To determine

whether an action is objectively unreasonable depends "on the facts and circumstances of each particular case," and factors including "the relationship between the need for the use of force and the amount of force used[,] the extent of the plaintiff's injury[,] any effort made by the officer to temper or to limit the amount of force[,] the severity of the security problem at issue[,] the threat reasonably perceived by the officer[,] and whether the plaintiff was actively resisting," may bear on this determination.  *See Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (citations omitted).  These considerations take into account the reality that operating a prison "is an inordinately difficult undertaking."  *Ross v. Willis*, No. 16-CV-6704, 2021 WL 3500163, at *9 (S.D.N.Y. Aug. 9, 2021) (quoting *Kingsley*, 576 U.S. at 399).

Cardoza argues that the medical evidence contradicts plaintiff's claim that Cardoza used unreasonable or excessive force.  *See* Ben-Zvi Decl. at 3, 14.  However, the Second Circuit has held that even the absence of medical treatment "is not fatal" to an excessive force claim.  *See Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987); *see also Jennings v. Decker*, No. 17-CV-54, 2021 WL 3471557, at *9 (N.D.N.Y. Aug. 6, 2021) (rejecting argument that summary judgment was appropriate where "Plaintiff's medical records do not show proof of a complaint or treatment for injury"); *Joseph v. Deluna*, No. 15-CV-5602, 2018 WL 1474398, at *5 (S.D.N.Y. Mar. 23, 2018) (plaintiff's claims that he suffered injury and pain, even in "the absence of documentation of any serious injuries," sufficient for his excessive force claim to survive summary judgment); *Adedeji v. Hoder*, 935 F. Supp. 2d 557, 567 (E.D.N.Y. 2013) ("The slightness of injury suffered as a result of the challenged use of force . . . does not preclude a finding that such force was objectively unreasonable.").  "A beating severe enough to leave marks is sufficient proof of a compensable injury."  *Atkins v. New York City*, 143 F.3d 100, 104 (2d Cir. 1998) (granting plaintiff's motion for a new trial after jury awarded only nominal

damages) (citing *Wheatley*, 637 F.2d at 866-67).

Cardoza further argues that the medical records do not support plaintiff's testimony that plaintiff sustained injuries to his nose, ears, lower back, torso and right hand.  *See* Ben-Zvi Decl. at 8.  However, a review of the records belies Cardoza's claim.  The medical records from the day of the incident demonstrate that plaintiff suffered "abrasions" with "open skin" to his ear, a "swollen nose bridge with tenderness and erythema," "mild tenderness midline over L4-5," and a "contusion" to his right knee.  *See* Pl. Ex. 4, Dkt. 122-2 at ECF page 3; Def. Ex. O, Dkt. 120-1 at ECF page 4.[5]

The medical records from the day after the incident reflect that plaintiff suffered "redness and swelling over the nose," "mild low back tenderness," "swelling of nose and nasal bridge, tender," and "lumbar region, tender."  *See* Pl. Ex. 3, Dkt. 122-1; Def. Ex. O, Dkt. 120-1 at ECF pages 9, 10.  Plaintiff was prescribed over-the-counter pain medication for his injuries.  *See* Def. Ex. O, Dkt. 120-1 at ECF page 11.  The medical records corroborate plaintiff's testimony as to the nature and extent of his injuries; the photographic evidence of plaintiff's injuries taken shortly after the incident depict fresh contusions, lacerations and bruising to his face, nose, ears, and torso.  *See* Pl. Ex. 2, Dkt. 121-2.  Further, the videos entered into evidence show Cardoza punching plaintiff in the head, placing him in a headlock and tackling him to the ground.  *See Szabo v. Parascandolo*, No. 16-CV-3683, 2019 WL 481925, at *5 (E.D.N.Y. Feb. 7, 2019) (denying defendants' motion for summary judgment where surveillance video showed defendant "making a kicking motion in the direction of Plaintiff's left leg while Plaintiff was subdued on the ground by other officers").

---

[5] References to the page numbers generated by the Court's electronic case filing system appear as "ECF page."

Based on the evidence admitted at trial, including plaintiff's testimony, the medical records, and videos, the jury likely credited plaintiff's testimony that Cardoza threw the first punch with sufficient force causing plaintiff's knees to buckle and that Cardoza subsequently put plaintiff in a chokehold that restricted plaintiff's breathing.  Tr. at 395, 397-98.  Nervil then administered several punches and kicks to plaintiff while plaintiff was being held in a chokehold by Cardoza.  *Id.* at 397-98.  Based on the evidence at trial, the jury could reasonably conclude that Cardoza used excessive force as alleged.

### 2.    Causation

Cardoza next argues that he could not have caused plaintiff's injuries based on the information set forth in the medical records.  *See* Ben-Zvi Decl. at 3, 14.  With respect to causation, in an excessive force claim, a plaintiff must prove that any injury suffered was proximately caused by the unreasonable force at issue.  *See Atkins*, 143 F.3d at 103; *Gibeau v. Nellis*, 18 F.3d 107, 110 (2d Cir. 1994).

Here, Cardoza attempts to minimize his role in the incident by characterizing his conduct as throwing only one punch, using a "proper take down hold" and administering pepper spray. *See* Ben-Zvi Decl. at 3.  However, as detailed above, plaintiff testified that Cardoza not only punched plaintiff in the face unprovoked, but Cardoza put him in a chokehold that obstructed his breathing and brought him to the ground while Nervil kicked and punched plaintiff.  The injuries documented in plaintiff's medical records corroborate plaintiff's testimony and the nature of the altercation as depicted in the videos.

Plaintiff testified that Cardoza initiated the incident by ordering plaintiff into the vestibule and striking him unprovoked.  As it relates to causation, the jury received the following instruction:

> An act is a proximate cause if it was a substantial factor in bringing about or actually causing the alleged injury, that is, if the injury or damage was a reasonably foreseeable consequence of the defendant's act.  If an injury was a direct result or a reasonably probable consequence of a defendant's act, it was proximately caused by such act.

Jury Charge at 14, Dkt. 111.

It was reasonable for the jury to find that a foreseeable consequence of Cardoza attacking plaintiff and any ensuing altercation would trigger a rapid and aggressive response from other officers coming to assist Cardoza.  Indeed, Nervil testified that he entered the fray to help Cardoza because he saw Cardoza and plaintiff engaged in a struggle.  Tr. at 301, 303, 312.  The jury, therefore, properly found Cardoza liable as a proximate cause of plaintiff's injuries that were directly inflicted by co-defendant Nervil, especially given Cardoza's efforts to immobilize plaintiff on the ground at the time.  The Court may presume that the jury followed the instructions regarding causation.  *See Britt v. Garcia*, 457 F.3d 264, 272 (2d Cir. 2006) ("It is a fundamental proposition that a jury is presumed to follow the instructions of the trial judge.") (internal quotation marks and citation omitted).  In fact, as demonstrated by the verdict, the jury credited plaintiff's testimony and his version of events over defendants' version.  The proof at trial, including plaintiff's testimony, the nature of the altercation, the medical records, and the videos, were more than sufficient for a rational jury to find that Cardoza was a proximate cause of plaintiff's physical and emotional injuries.  *See Tranchina v. McGrath*, No. 17-CV-1256, 2021 WL 1599189, at *6 (N.D.N.Y. Apr. 23, 2021), *aff'd*, 2022 WL 17491727 (2d Cir. Dec. 8, 2022). For these reasons, the Court does not find a basis for granting the motion for a new trial on the issue of liability.

### B.    Plaintiff's Closing Argument

Cardoza argues that plaintiff's counsel's closing argument requesting specific dollar

amounts in damages caused the jury to ignore the evidence at trial.  While the Second Circuit "disfavors" such requests to the jury, the court "has not adopted a *per se* rule about the propriety of suggested damage amounts."  *Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1016 (2d Cir. 1995), *vacated on other grounds*, 518 U.S. 1031 (1996); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997).  Since defendants failed to object to plaintiff's counsel's comments, a new trial would be warranted only for plain error.  *See O'Hara v. City of New York*, 570 F. App'x 21, 25 (2d Cir. 2014).

Here, the Court specifically instructed the jury that "[t]he closing arguments of the attorneys are not evidence."  Jury Charge at 5.  Such an instruction cures any potential prejudice. *See Thomas v. Kelly*, 903 F. Supp. 2d 237, 265 (S.D.N.Y. 2012).  Cardoza contends the jury "simply defaulted to the random and exorbitant numbers provided by [p]laintiff's counsel."  Ben-Zvi Decl. at 16-17.  Nevertheless, the amounts requested by counsel in summation ($7.4 million in compensatory damages and $10 million in punitive damages) do not appear to have any connection to the amounts awarded by the jury.  Tr. at 661-62.  Accordingly, there is no cause to believe that counsel's summation improperly swayed the jury.  *See Lightfoot*, 110 F.3d at 913 (denying motion for new trial even though jury awarded "exactly half of the demand by plaintiff's counsel").  In any event, as discussed below, the Court finds the jury's damages award excessive.

### C.    Jury Deliberations

Cardoza argues that the jury spent an insufficient amount of time deliberating and "was far more concerned with finishing their deliberations before 5 [p.m.] on Friday afternoon."  Ben-Zvi Decl. at 18.  However, Cardoza cites no authority for the proposition that the length of jury deliberations warrants a new trial.  On the contrary, "[b]rief deliberation, by itself, does not show

that the jury failed to give full, conscientious or impartial consideration to the evidence." *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999) (upholding denial of new trial motion where jury deliberated for twenty minutes); *see also Lindsey v. Butler*, No. 11-CV-9102, 2022 WL 17849009, at *7 (S.D.N.Y. Dec. 22, 2022) (denying motion to set aside verdict based on duration of deliberations); *Green v. Groneman*, 634 F. Supp. 2d 274, 276-77 (E.D.N.Y. 2009) (rejecting argument that short period of deliberations warranted new trial).

Although Cardoza argues that the time spent deliberating was insufficient to review all the evidence, the video depicting the incident was shown numerous times during the trial in painstaking detail.  In addition, as discussed above, the medical records admitted into evidence support, rather than refute, plaintiff's claims of injuries.  Moreover, Cardoza cannot draw any connection between the timing of deliberations and the specific damages awarded.  The jury just as easily could have awarded a smaller amount of damages in the same amount of time it deliberated here.  *See ABKCO Music*, 50 F.4th at 325-26.  In fact, the "path of least resistance" would have been to render a defense verdict and obviate the need for any determination of damages.  *See ABKCO Music, Inc. v. Sagan*, 500 F. Supp. 3d 199, 210 (S.D.N.Y. 2020), *aff'd in relevant part and vacated on other grounds,* 50 F.4th 309.

### D.    Duplicative Damages

Cardoza and Nervil both argue that the jury's damages award against each defendant was improperly duplicative because the jury awarded the same amount of damages against each defendant.  *See* Mem. of Law in Support of Defendant [Phanes] Nervil's Motion for Remittitur or in the Alternative a New Trial on Damages ("Nervil Mem."), Dkt. 132-2 at 14-15; Ben-Zvi Decl. at 4, 17-18.  However, the verdict does not indicate that the jury failed to consider each defendant individually.  Through the testimony at trial and the video evidence, the jury was

14

presented with sufficient evidence of each defendant's conduct to find that they were each equally liable for plaintiff's damages.

Cardoza initiated the incident by ordering plaintiff into the vestibule area and punching him in the face, according to plaintiff, unprovoked.  Cardoza then grabbed plaintiff in a headlock and brought him to the floor, while Nervil punched, kicked and stomped on plaintiff when plaintiff was on the ground.  Not satisfied with the punishment administered thus far, Cardoza then directed pepper spray toward the area around plaintiff's eyes.  Based on this evidence, it was reasonable for the jury to find that each defendant was equally liable for violating plaintiff's civil rights.  *See Saleh*, 2022 WL 4078150, at *27 (rejecting argument that punitive damages awards against two separate entities were duplicative).

Indeed, the jury instructions and verdict sheet correctly instructed the jury to award only those damages that would reasonably compensate plaintiff for whatever injuries were proximately caused by that defendant's unlawful actions.  The jury charge specifically stated as follows:

> [Y]ou must remember that each one of the defendants is entitled to have you review the evidence as it relates to his conduct separately.  You must consider the evidence relating to each defendant's actions independently, and you must reach a conclusion solely on the basis of that independent consideration.

Jury Charge at 10, Dkt. 111.

The jury is presumed to have followed the Court's instructions.  *See Jackson v. Tellado*, 295 F. Supp. 3d 164, 184 (E.D.N.Y. 2018) (rejecting argument that jury failed to consider the liability of each defendant individually).  Moreover, the verdict sheet itself demonstrates the "jury's individualized determinations of liability as to each [d]efendant."  *Id.*  Importantly, defendants did not request any additional instruction on duplicative damages in their requests to charge nor did they raise any objections to the jury instructions or the verdict sheet.  *Id.* at 184-85

15

(finding that defendants waived any objections to verdict sheet).  In sum, Cardoza and Nervil have not demonstrated that the jury's award is duplicative merely because the damages awarded are the same for each defendant.  *See Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 154 (2d Cir. 1991) ("It is, of course, possible that the jury committed the error of duplicating damages here, but defendants have failed to establish this allegation with any degree of certainty.").

The sole case cited by defendants, *Bender v. City of New York*, 78 F.3d 787 (2d Cir. 1996), is inapposite.  *See* Nervil Mem. at 15.  The court found that there was some duplication between the awards for two claims of false arrest, where different defendant officers made the arrests, but the two arrests resulted in a single period of confinement.  *See Bender*, 78 F.3d at 793-94.  Similarly, the court found duplication regarding awards for malicious prosecution against two defendants for prosecuting the same charges.  *See id.* at 794.  The same logic does not apply to the instant excessive force claim.

## III.   Compensatory Damages

Defendants also move for a remittitur, or, alternatively, for a new trial under Rule 59 on the grounds that the award of damages is against the weight of the evidence, represents a serious miscarriage of justice and is grossly out of proportion to the injuries suffered by plaintiff.  *See* Nervil Mem. at 1; Ben-Zvi Decl. at 1.  Defendants argue that the evidence admitted at trial is insufficient to support the compensatory damages awarded.  Defendants primarily contend that the medical records in evidence undercut plaintiff's claims of injuries and that plaintiff submitted insufficient evidence of emotional damages.  Among other things, defendants argue that plaintiff had pre-existing injuries to his back, nose and right hand, as well as previous mental health issues.  *See* Nervil Mem. at 2, 12; Ben-Zvi Decl. at 2-3, 8.

"[W]here the jury has found a constitutional violation and there is no genuine dispute that

the violation resulted in some injury to the plaintiff, the plaintiff is entitled to an award of compensatory damages as a matter of law." *Kerman v. City of New York*, 374 F.3d 93, 124 (2d Cir. 2004).  Compensatory damages may be awarded for "humiliation, injuries, damage to reputation, mental anguish and suffering."  *Anderson v. Osborne*, No. 17-CV-539, 2020 WL 6151249, at *7 (S.D.N.Y. Oct. 20, 2020) (quoting *Manganiello v. Agostini,* No. 07-CV-3644, 2008 WL 5159776, at *18 (S.D.N.Y. Dec. 9, 2008)); *see also Memphis Comm. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986).  "To recover compensatory damages . . ., a plaintiff must prove that his injuries were proximately caused by the constitutional violation."  *Gibeau*, 18 F.3d at 110.

### A.    Evidence of Injuries

Nervil argues that the medical records and trial testimony "establish that [plaintiff] had pre-existing injuries to his back, nose, [and] right hand."  Mem. of Law in Response to Plaintiff's Opposition and in Further Support of Defendant Phanes Nervil's Motion for [Remittitur] or in the Alternative a New Trial on Damages ("Nervil Reply Mem."), Dkt. 139 at 1.  Nervil describes several incidents where plaintiff was injured within two months prior to the altercation at issue. *See* Nervil Mem. at 2.  However, defendants have not demonstrated that the injuries claimed by plaintiff in this case stem from any pre-existing injuries.  In fact, other than plaintiff's casted right hand, there is no indication that the prior incidents resulted in lasting injuries.

In contrast, the medical records from the day of the incident demonstrate that as a result of a use of force incident, plaintiff suffered "abrasions" with "open skin" to his ear, a "swollen nose bridge," "mild tenderness midline over L4-5," and a "contusion" to his right knee.  *See* Pl. Ex. 4, Dkt. 122-2 at ECF page 3; Def. Ex. O, Dkt. 120-1 at ECF page 4.  As a result of these injuries, plaintiff underwent imaging of his lumbar spine and was referred for "nasal bone and

LS" x-rays.  *See* Pl. Ex. 4, Dkt. 122-2 at ECF page 3; Def. Ex. O, Dkt. 120-1 at ECF pages 5, 7.

The medical records from the day after the incident reflect that plaintiff suffered "redness and

swelling over the nose," "mild low back tenderness," "swelling of nose and nasal bridge, tender,"

"lumbar region, tender," and multiple "contusions."  *See* Pl. Ex. 3, Dkt. 122-1 at ECF page 2;

Def. Ex. O, Dkt. 120-1 at ECF pages 9, 10.  Photographs of plaintiff taken shortly after the

incident, which depict contusions, lacerations and bruising to plaintiff's face, nose, ears, and

torso, corroborate the freshness of the injuries documented in the medical records.  *See* Pl. Ex. 2,

Dkt. 121-2.  In addition, the video of the altercation is consistent with the injuries claimed by

plaintiff.

Contrary to defendants' argument, the medical records support plaintiff's claim that he

sustained injuries as a result of the incident.  Plaintiff testified that he sustained injuries to his

nose, ears, lower back, and torso.  Tr. at 403-04.  Plaintiff submitted evidence that following the

assault on October 13, 2015, he sought medical attention and reported to medical staff that his

injuries resulted from the assault.  Defendants fail to establish that the specific injuries, as

described by plaintiff, depicted in the photographs of plaintiff, and documented in the medical

records, were pre-existing injuries.[6]  In sum, the jury could have reasonably concluded – which it

did here -- that defendants' actions caused plaintiff's injuries.

Defendants further argue that plaintiff's emotional distress injuries stem from "pre-

existing mental health issues with prescription medication treatment."  Nervil Reply Mem. at 8.

However, defendants fail to explain how plaintiff's pre-existing mental health issues overlap

---

[6] Even assuming plaintiff had pre-existing injuries that defendants aggravated by the use of
excessive force, an exacerbation of those injuries would not preclude plaintiff from recovering
damages for those injuries.  *See Porath v. Bird*, No. 11-CV-963, 2013 WL 2418253, at *25
(N.D.N.Y. June 3, 2013).

with the emotional distress plaintiff described at trial that resulted from the assault. Plaintiff testified that the assault by correction officers in front of a group of inmates caused him humiliation and resulted in feelings of isolation. Tr. at 404-05, 432, 466-67, 480, 481-82. The jury likely credited plaintiff's testimony regarding both his emotional distress and the causal connection between defendants' conduct and that distress; the Court defers to the jury's credibility determinations. *See Makinen v. City of New York*, 167 F. Supp. 3d 472, 489 (S.D.N.Y. 2016) (rejecting defendants' arguments that plaintiff "failed to show that 'other stressors in their lives' were not the true causes of their emotional distress"), *aff'd in part and rev'd in part on other grounds*, 722 F. App'x 50 (2d Cir. 2018). Moreover, the "objective circumstances of the violation itself" support plaintiff's testimony that the assault caused his emotional injuries. *See Williams v. Marinelli*, No. 13-CV-1154, 2017 WL 11473740, at *20 (D. Conn. Feb. 8, 2017) (citing *Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 55 (2d Cir. 2002)). To be sure, the substantial physical injuries sustained by plaintiff are consistent with a claim for emotional distress damages. *See Williams*, 2017 WL 11473740, at *20 (finding that plaintiff's physical injuries, including "multiple lacerations on his head, a large bump above his eye, two knots on the top of his head, an abrasion on his face, a swollen forehead, a swollen cheek, a swollen lip, a swollen knee, a scratched ankle, and black and blue bruises all over his body" provide "a proper basis for [plaintiff] to recover damages for emotional harm").

### B.      Nominal or Compensatory Damages

Cardoza argues that even if the jury properly found him liable, his conduct warrants an award of nominal damages only. *See* Ben-Zvi Decl. at 3, 15. In an excessive force case, in the absence of injuries, or where the injuries are *de minimis*, nominal damages may be awarded in

place of compensatory damages.  *See, e.g., Ali v. Kipp*, 891 F.3d 59, 64 (2d Cir. 2018); *Kerman v. City of New York*, 374 F.3d 93, 123-24 (2d Cir. 2004).  As discussed above, compensatory damages against Cardoza are appropriate where, as here, the jury had sufficient evidence at trial to conclude that Cardoza's use of excessive force proximately caused plaintiff's injuries. Moreover, plaintiff, who sustained serious bruising and lacerations to his face, nose, ears, and torso from the incident, did not suffer from *de minimis* injuries.  *See Tranchina*, 2022 WL 17491727, at *2 (plaintiff's "injuries, including serious bruising and lacerations to his head, side, and back, as well as a fractured rib, were not *de minimis*"); *Anderson*, 2020 WL 6151249, at *3 (finding that injuries were more than *de minimis* where plaintiff "sustained bruising on his hands and toes, scrapes to his body, was ambulating with a limp, and complained of pain to his head, ribs, and other parts of his body"); *Chen v. Cnty. of Suffolk*, 927 F. Supp. 2d 58, 67-68 (E.D.N.Y. 2013) (rejecting argument that injuries were *de minimis* where medical records indicated that the plaintiff had abrasions on her face, left arm and leg, wrists and hands, and bruising on her upper arms and knees).  In fact, given the seriousness of plaintiff's injuries, medical providers ordered plaintiff to undergo x-rays of his nose and back, *see* Def. Ex. O, Dkt. 120-1 at ECF pages 5, 7, which presumably would not have been necessary if the medical providers had found his injuries *de minimis*, s*ee Anderson*, 2020 WL 6151249, at *3 ("medical staff would not have sent plaintiff for an outside evaluation had plaintiff sustained only minor injuries").  In addition, plaintiff's injuries were sufficiently serious that he was prescribed pain medication (albeit over-the-counter drugs).  *See* Def. Ex. O, Dkt. 120-1 at ECF page 11.

### C.   Excessiveness of Compensatory Damages Award

The jury awarded plaintiff a total of $500,000 in compensatory damages.  Defendants argue that the compensatory damages award is excessive based on the nature of plaintiff's

physical and emotional distress injuries, and that the appropriate range of total compensatory damages in this case is $25,000 to $50,000.  *See* Nervil Mem. at 15.

### 1.   Physical Injuries

Typically, physical injuries as a result of excessive force are classified as either permanent or non-permanent.  *See, e.g., Jennings*, 2018 WL 5630454, at *14; *Dancy v. McGinley*, No. 11-CV-7952, 2015 WL 13214324, at *6-*7 (S.D.N.Y. May 11, 2015), *aff'd*, 843 F.3d 93 (2d Cir. 2016).  Awards in the middle to higher end of the spectrum usually involve permanent injuries.  *See Dancy*, 2015 WL 13214324, at *6-*7 (collecting cases).  In contrast, non-permanent injuries merit awards at the low end of the spectrum of compensatory damages.  *See Jennings*, 2018 WL 5630454, at *14; *Dancy*, 2015 WL 13214324, at *7.  Within the category of non-permanent injuries, evidence that plaintiff suffered a fracture is a factor that has been recognized by several courts in evaluating the severity of excessive force injuries.  *See, e.g., Jennings*, 2018 WL 5630454, at *14; *Dancy*, 2015 WL 13214324, at *7-*8.  Similarly, where plaintiff required surgery or stiches, awards for non-permanent injuries are usually higher.  *See Dancy*, 2015 WL 13214324, at *7-*8.

"Compensatory damage awards for single incidents involving strikes by police officers that result in loss of consciousness and associated lacerations -- but do not cause further injuries requiring surgery, or broken bones -- frequently run between $50,000 and $100,000."  *Poulos v. City of New York*, No. 14-CV-3023, 2018 WL 3750508, at *7 (S.D.N.Y. July 13, 2018), *adopted by* 2018 WL 3745661 (E.D.N.Y. Aug. 6, 2018); *see Greenburger v. Roundtree*, No. 17-CV-3295, 2020 WL 6561598, at *7 (S.D.N.Y. Jan. 16, 2020) (collecting cases), *adopted by* 2020 WL 4746460 (S.D.N.Y. Aug. 16, 2020); *Dancy*, 2015 WL 13214324, at *8 ("absent permanent physical injuries or serious psychological injuries, such awards generally result in less than

$100,000").

The Court agrees with defendants that the medical records in evidence demonstrate that plaintiff did not suffer permanent physical injuries;[7] indeed, plaintiff has not claimed permanent injuries, *see* Pl.'s Mem. of Law in Opposition to Defs.' Motions for [Remittitur] ("Pl. Mem."), Dkt. 135 at 8-9 (citing cases with no permanent injuries).  Rather, the injuries asserted by plaintiff primarily consist of bruising and lacerations; plaintiff has not presented evidence of ongoing treatment.  Further, there is no evidence that the injuries suffered by plaintiff as a result of the incident did not resolve on their own in a short time period.  Indeed, medical records from October 22, 2015, eight days after the incident, reflect that the contusions on plaintiff's face "are stable and resolving" and "[t]here may be some general pain but likely not associated with these injuries."  *See* Def. Ex. O, Dkt. 120-1 at ECF pages 16, 17.  On October 28, 2015, fifteen days after the incident, according to medical records, plaintiff denied any recent trauma, worsening pain or numbness to his right hand.  *See* Def. Ex. E, Dkt. 117-5 at ECF page 2.

### 2.      Emotional Distress

As for emotional injuries, such claims are classified as either garden-variety, significant or egregious, with the amount of damages awarded dependent on the classification.  *See Sooroojballie v. Port Auth. of N.Y. & N.J.*, 816 F. App'x 536, 546 (2d Cir. 2020); *Jennings*, 2018 WL 5630454, at *14.  Garden-variety claims "lack extraordinary circumstances and are not supported by medical testimony"; the evidence of emotional harm is typically limited to the plaintiff's testimony.  *Sooroojballie*, 816 F. App'x at 546 (internal citations omitted); *see Saleh*, 2022 WL 4078150, at *24 (garden variety cases are characterized "by more limited evidence of emotional harm" and "by a lack of medical testimony corroborating plaintiff's claims");

---

[7] *See* Nervil Mem. at 3-5; Ben-Zvi Decl. at 9-13; Ben-Zvi Reply Decl. at 5-9.

*Jennings*, 2018 WL 5630454, at *14.  "[G]arden variety emotional distress claims generally

merit \$30,000 to \$125,000 awards[.]"  *EEOC v. United Health Programs of Am., Inc.*, No. 14-

CV-3673, 2020 WL 1083771, at *13 (E.D.N.Y. Mar. 6, 2020) (internal quotation marks and

citation omitted); *accord Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*, No.

18-CV-6836, 2022 WL 17689836, at *9 (S.D.N.Y. Dec. 15, 2022); *Saleh*, 2022 WL 4078150, at

*24.  "Significant emotional distress claims are based on more substantial harm or offensive

conduct and may be supported by medical testimony, evidence of treatment by a healthcare

professional, and testimony from other witnesses."  *Sooroojballie*, 816 F. App'x at 546 (citation

omitted); *see Jennings*, 2018 WL 5630454, at *14.  Finally, "[e]gregious emotional distress

claims yield the highest awards and are warranted only where the [defendant's] conduct was

outrageous and shocking or affected the physical health of the plaintiff."  *Sooroojballie*, 816 F.

App'x at 546 (citation omitted); *see also Jennings*, 2018 WL 5630454, at *14.

 Defendants' argument that plaintiff's testimony alone is insufficient to establish

emotional distress damages is unpersuasive.[8]  *See, e.g.*, Nervil Mem. at 11-12.  Defendants

principally rely on the Second Circuit's decision in *Annis  v. County of Westchester*, 136 F.3d

239 (2d Cir. 1998), for the proposition that emotional distress damages cannot be established

solely by plaintiff's testimony.  However, *Annis* is distinguishable on its facts.  Plaintiff in *Annis*

alleged a claim of sex discrimination and testified at trial that she was humiliated by the

discrimination she endured.  *Id.* at 244.  The Second Circuit vacated the damages award because

"the only evidence of [her] emotional distress -- her own testimony -- is insufficient to warrant

---

[8] However, Nervil also appears to acknowledge that plaintiff's testimony alone gives rise to
"garden variety mental anguish claims."  *See* Nervil Mem. at 12 ("Shuford's testimony is of the
garden variety mental anguish claims wherein the testimony was vague and conclusory and was
not supported by any medical evidence, testimony, or proof.") (citing cases awarding damages
for emotional distress).

an award of compensatory damages for that injury." *Id.* at 249.  But, the court itself indicated that its holding was based on the nature of the plaintiff's testimony, rather than the absence of corroboration.  *Id.*  As one court explained:

> District courts in this Circuit interpreting *Annis* have generally understood the Second Circuit's holding as not requiring a specific kind of support to justify emotional distress damages; but rather, have read it narrowly in the context of the Second Circuit's other precedents to hold that the holding in *Annis* is based on the particularly minimal evidence provided by the plaintiff in that case.

*Dejesus v. Vill. of Pelham Manor*, 282 F. Supp. 2d 162, 177-78 (S.D.N.Y. 2003) (collecting cases) (citations omitted).  Here, in contrast, as Nervil recognizes, plaintiff testified that he was "humiliated, embarrassed, experienced a loss of enjoyment of life and a lack of trust" as a result of the incident.  *See* Nervil Mem. at 12.  Plaintiff further testified, in contrast to the *Annis* plaintiff, that his humiliation and embarrassment manifested itself in his tending to isolate himself from others.

In any event, where a plaintiff's evidence of an emotional injury consists of his own testimony, it may be substantiated by other evidence, such as "the objective circumstances of the violation itself."  *Patrolmen's Benevolent Ass'n*, 310 F.3d at 55; *see Walz v. Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995) (affirming award of emotional distress damages based on plaintiffs' testimony about the circumstances of the violation and their reaction to it).  Here, plaintiff's testimony and the objective circumstances of the assault (*see* Section III.A, above) justify emotional damages even absent corroborating medical testimony.  *See Tranchina*, 2021 WL 1599189, at *6 ("Plaintiff's testimony regarding his emotional injuries, the evidence of the nature of the altercation, and photographic and medical records of Plaintiff's injuries are sufficient for the jury to find that [defendant] proximately caused Plaintiff's emotional injuries."); *Williams*, 2017 WL 11473740, at *20; *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d

24

280, 328 (S.D.N.Y. 2016) ("A court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony.") (citation omitted); *see also Miner v. City of Glen Falls*, 999 F.2d 655, 663 (2d Cir. 1993) (upholding compensatory damages award for emotional distress based on testimony of plaintiff and his wife).  Moreover, the Court defers to the jury's credibility determination that plaintiff suffered emotional distress damages as a result of the assault.  *See Reiter v. Metro. Transp. Auth. of New York*, No. 01-CV-2762, 2003 WL 22271223, at *8 (S.D.N.Y. Sept. 30, 2003); *Uddin v. New York City/Admin. for Children's Servs.*, No. 99-CV-5843, 2001 WL 1512588, at *5 (S.D.N.Y. Nov. 28, 2001).

However, the Court finds that plaintiff suffered no more than garden-variety emotional distress damages.  Plaintiff provided limited testimony regarding the extent of his emotional distress.  Plaintiff testified that he felt humiliated being beaten in front of other inmates in his housing unit.  Tr. at 432.  In addition, he testified that he "sometimes . . . isolate[s] [him]self from people" and does not "trust people."  *Id.* at 404; *see id.* at 405 ("I don't trust people.  I don't like people. . . .  I like to be alone now.").  Plaintiff did not testify as to the severity or duration of these symptoms.  Plaintiff offered no evidence that he received treatment for his emotional distress or proffered any testimony on the likely psychological impact of the incident at issue, particularly since he had experienced several other assaults by correction officers and other inmates, both before and after the incident at issue.

### 3.    The Compensatory Damages Award as a Whole

"Where, as here, the jury 'did not specify the categories of damages it awarded, the Court should 'consider whether the award as a whole is excessive to compensate [plaintiff] for the injuries and losses that were supported by the evidence."  *Small v. City of New York*, No. 09-CV-

1912, 2022 WL 1261739, at *15 (S.D.N.Y. Apr. 28, 2022) (quoting *Tatum v. Jackson*, 668 F.

Supp. 2d 584, 600 (S.D.N.Y. 2009)).  Here, taken together, the evidence does not support the

amount of compensatory damages awarded.  Plaintiff's non-permanent physical injuries typically

result in an award between $50,000 and $100,000.  *See Poulos*, 2018 WL 3750508, at *7.

Plaintiff's garden-variety emotional damages generally merit an award of no more than

$125,000.  *See Saleh*, 2022 WL 4078150, at *24.  As the Second Circuit has observed:  "We

must ensure proportionality, to control for the inherent randomness of jury decisions concerning

appropriate compensation for intangible harm, and to reduce the 'burdensome costs on society'

of over-extensive damages awards."  *Turley*, 774 F.3d at 162 (quoting *Stampf v. LIRR*, 761 F.3d

192, 205 (2d Cir. 2014)).  Accordingly, the Court will examine the awards in comparable cases.[9]

*See DiSorbo*, 343 F.3d at 184; *Jennings*, 2018 WL 5630454, at *14.

### 4.    Comparable Excessive Force Cases

"Compensatory damages awards for excessive force claims in this Circuit vary greatly."

*Tranchina*, 2021 WL 1599189, at *6.  Particularly instructive to this case is *Jennings v. Yurkiw*,

No. 14-CV-6377, 2018 WL 5630454 (E.D.N.Y. Oct. 31, 2018), *aff'd*, 18 F.4th 383 (2d Cir.

2021).  In *Jennings*, when plaintiff took his three-year old son to the apartment of his son's

mother, an altercation ensued.  *See* 2018 WL 5630454, at *1.  After police officers responded to

the scene, they pinned plaintiff against a wall and one of the officers punched plaintiff twice in

the face.  *See id.* at *2.  Two other officers joined in the beating and plaintiff fell in and out of

---

[9] The awards in comparable cases must be adjusted for inflation when considered by the court.
*See Jennings v. Yurkiw*, 18 F.4th 383, 393 & n.7 (2d Cir. 2021); *Theodat v. City of New York*,
No. 16-CV-3977, 2019 WL 4385794, at *6 & n.5 (E.D.N.Y. Sept. 13, 2019), *aff'd*, 818 F. App'x
79 (2d Cir. 2020).  Here, the Court uses the Bureau of Labor Statistics' Inflation Calculator to
adjust for inflation as of April 2022 (when the verdict was rendered).  *See* CPI Inflation
Calculator, U.S. Bureau Of Lab. Stat., bls.gov/data/inflation_calculator.htm.

consciousness while the officers dragged him from the apartment through the apartment building lobby and into a police car. *See id.* As a result of the assault, plaintiff suffered a nasal fracture, a deviated nasal septum, a hematoma on his eye and swelling on his head. *See id.* at *2, *14. Plaintiff further alleged that his nose was permanently crooked and that he continued to suffer from "painful headaches," although he did not receive treatment beyond a few days after the assault. *See id.* Plaintiff offered no evidence of treatment for emotional injuries or any expert evidence; he merely testified that "he was 'emotional' as a result of being beaten in front of his son." *Id.* at *14. The jury awarded total compensatory damages in the amount of $500,000 against the three defendant police officers. *See id.* After the defendants moved for remittitur, the court ordered a new trial on damages unless plaintiff accepted an award of compensatory damages of $115,000 (approximately $131,940.42, accounting for inflation) as "the maximum amount the jury could reasonably have awarded as compensation for Plaintiff's injuries." *Id.* at *15. Plaintiff refused to accept the remittitur option and the Court held a retrial on damages. *See Jennings v. Yurkiw*, No. 14-CV-6377, 2019 WL 6253813, at *1 (E.D.N.Y. Nov. 22, 2019). The second jury returned a verdict in the amount of $90,000 in compensatory damages, jointly and severally against the officers. *See id.* Neither party challenged this second award of compensatory damages. However, on appeal, the plaintiff challenged the district court's remittitur of his compensatory damages award from $500,000 to $115,000. *See* 18 F.4th at 386. The Second Circuit affirmed the district court's remittitur, distinguishing those cases where plaintiffs with similar physical injuries underwent surgery or required ongoing treatment. *See id.* at 394. The court further noted that the plaintiff had not submitted extensive evidence of his emotional injuries. *See id.* Finally, the court observed that the second jury's award of $90,000 in compensatory damages confirmed the district court's conclusion that $115,000 was on the

high end for a single claim of excessive force involving non-permanent injuries.  *See id.* at 394-95.

In *Anderson*, plaintiff alleged that in retaliation for reporting misconduct by correction officers, an officer punched him in the face, followed by other officers striking plaintiff, pushing him to the floor, and stomping and kicking plaintiff, during a beating that lasted for several minutes.  Plaintiff received treatment from an outside hospital due to "significant swelling in his upper thigh area and to confirm plaintiff did not have any broken bones."  2020 WL 6151249, at *3.  According to the medical evidence, plaintiff sustained "bruising on his hands and toes, scrapes to his body, was ambulating with a limp, and complained of pain to his head [and] ribs." *Id.*  With respect to emotional distress damages, plaintiff testified that he "was fearful of further excessive force incidents and had difficulty sleeping."  *Id.* at *7.  The Court found the jury's award of $75,000 in compensatory damages (approximately $83,823.03, accounting for inflation) reasonable.  *See id.*

In *Dancy*, the jury awarded plaintiff, a 17-year-old high school student, $100,000 on his excessive force claim.  *See* 2015 WL 13214324, at *1, *3.  The defendant officer had spun the plaintiff to the ground, put his knee in plaintiff's back and punched him in the ribs.  *Id.* at *8.  The evidence at trial regarding physical injuries primarily consisted of plaintiff's testimony and medical records:  plaintiff suffered bruises to his head, face, torso, back and elbow and had pain urinating, which resolved in two to three weeks.  *Id.* at *3, *9.  Plaintiff did not suffer from any fractures.  *See id.*  Plaintiff further testified to having lingering headaches and soreness.  *See id.* at *3.  The evidence concerning plaintiff's emotional injuries consisted of plaintiff's testimony and the testimony of his mother that largely described changes to plaintiff's mood and decreased academic drive.  *See id.* at *4-*6.  The court remitted the $100,000 excessive force verdict to

$81,500 (approximately $100,345.74, accounting for inflation).  *See id.* at *10, *aff'd in part and vacated in part on other grounds*, 843 F.3d at 114.

In *Poulos,* the court conducted a damages inquest following defendants' default.  *See* 2018 WL 3750508, at *1, *adopted by* 2018 WL 3745661 (S.D.N.Y. Aug. 6, 2018).  Plaintiff alleged that he suffered a single punch to the head by a police officer, while plaintiff was being held at Central Booking.  *See* 2018 WL 3750508, at *2.  The punch caused plaintiff to lose consciousness and he suffered a laceration three inches long and two centimeters deep above his right eyebrow, which required sutures, and left a visible scar approximately one inch long.  *See id.* at *6.  Plaintiff testified to suffering "stress and anxiety," and having a "fear for [his] life and safety at the hands of police officers," as a result of the incident.  *Id.*  While the court recognized that plaintiff's injuries "caused some long-term symptoms, including a permanent scar, reduced vision, intermittent twitching in one eye, and pain," the court rejected plaintiff's request for compensatory damages in the amount of $300,000, and instead recommended $100,000 in compensatory damages (approximately $114,723.06, accounting for inflation).  *See id.* at *7; *see also Greenburger*, 2020 WL 6561598, at *8 (in damages inquest, recommending compensatory damages of $100,000 for excessive force where plaintiff sustained a deep head wound requiring five stitches, has "lasting physical pain" to his back, and attested to "continued emotional effects"), *adopted by* 2020 WL 4746460 (S.D.N.Y. Aug. 16, 2020).

In *Tranchina*, the plaintiff testified that one correction officer repeatedly punched him in the side of the head and his ribs (plaintiff estimated 40 times), during an assault that lasted between one-and-a-half and three minutes.  *See* 2021 WL 1599189, at *1, *3.  Plaintiff presented evidence of "a number of scratches, bruises, and swelling on his face, ears, hands, and torso," as well as sustaining a broken rib, in addition to evidence that plaintiff "may have sustained a

concussion." *See id.* at *5.  Plaintiff testified that he "experienced, and continues to experience, difficulty sleeping and recurring thoughts about the incident." *See id.* at *6.  The court found that the jury's award of $190,000 (approximately $210,957.15, accounting for inflation) was consistent with comparable cases and not excessive. *See id.*  On appeal, the Second Circuit affirmed the damages award, concluding that "the $190,000 compensatory damages award is not so high as to 'shock the judicial conscience.'" 2022 WL 17491727, at *2.

Here, although plaintiff argues that the $500,000 compensatory damages award in this case is not excessive, he concedes that "compensatory damages awards in similar cases typically fall within a range between $*25,000 and $250,000*," where there were "few if any permanent injuries." *See* Pl. Mem. at 8-9 (emphasis added).

An examination of the cases cited by plaintiff do not support the compensatory damages award in this case.  For example, in *Morales v. City of New York*, No. 99-CV-10004, 2001 WL 8594 (S.D.N.Y. Jan. 2, 2001), the court reduced the jury award of $2,750,000 to $50,000 (approximately $83,077.30, adjusting for inflation) where plaintiff suffered bruises on her legs and arm that required no serious medical treatment, but received months of counseling. *See id.* at *7-*10.  The court observed that "awards for simple batteries resulting in mild and non-permanent injuries tend to lead to awards substantially below $100,000." *Id.* at *8.

In *Disorbo*, the plaintiff was a woman who was arrested by the defendant police officer in retaliation for having spurned his advances at a bar. *See* 343 F.3d at 176.  At the police station, the defendant police officer "choked [plaintiff to the point that she began to lose vision], slammed [her] against the wall, thr[ew] [her] to the ground, struck [her] while defenseless on the floor," and "forcibly dragged [her] through the [police] station." *Id.* at 177.  The attack left plaintiff with "two large hematomas on her head," bruises throughout her upper body, and

"[p]ressure point bruises . . . on the top of her neck and behind her ear [that] were consistent with" being choked. *See id.* at 179.  Further, plaintiff sustained psychological injuries caused by the "highly traumatic nature" of the "brutal" attack. *Id.* at 184.  The court reduced an award of $400,000 to $250,000 (approximately $401,986.93, adjusting for inflation). *Id.* at 185-86.

Finally, in *Alla v. Verkay*, 979 F. Supp. 2d 349 (E.D.N.Y. 2013), the court upheld a jury award of $250,000 (approximately $311,317.12, adjusting for inflation) where the defendant officer "punched an unarmed, outnumbered and compliant suspect with enough force to break [his] cheekbone." *Id.* at 378-79.  The officer punched plaintiff in the face while he was handcuffed, causing him permanent injuries, including continual "pressure headaches," limited jaw function, memory impairment and emotional injuries, including "a cognitive disorder, major depression, [and] post-traumatic stress disorder." *Id.* at 362-65.  Plaintiff presented expert testimony from a neuro-rehabilitation psychologist who opined that he was punched hard enough to cause a traumatic brain injury, which is a "lifelong disability," and which in turn led to a cognitive disorder, preventing the plaintiff from pursuing his previous profession. *Id.* at 365.

Here, Nervil and Cardoza did not cause the same degree of long-term damage as the defendants in *Alla* and *Disorbo*.  The non-permanent physical and emotional injuries sustained by plaintiff are comparable, but less severe, than those at issue in the cases discussed above. Recognizing that the Court is charged with reducing an award "only to the maximum amount that would be upheld," this Court finds that **$125,000** against each defendant **($250,000** in total) is the maximum amount the jury could have reasonably awarded in compensatory damages for plaintiff's non-permanent injuries and garden-variety emotional distress damages.  This finding is consistent with the range of compensatory damages awarded in similar cases.

### III.     Punitive Damages

Defendants argue that no punitive damages should have been awarded in this case or, in the alternative, the punitive damages award is excessive.  *See* Ben-Zvi Decl. at 16; Nervil Mem. at 13-14.

"Punitive damages are available in a section 1983 case 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"  *Mathie*, 121 F.3d at 815 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).  "Awards of punitive damages are by nature speculative, arbitrary approximations."  *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013).  As with compensatory damages, a court may remit a punitive damages award when the award "shocks the conscience or constitutes a miscarriage of justice."  *Jennings*, 18 F.4th at 390; *see also Payne*, 711 F.3d at 96.  "In gauging excessiveness, [courts] must keep in mind the purpose of punitive damages:  to punish the defendant and to deter him and others from similar conduct."  *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (internal quotation marks and citation omitted).

In reviewing a punitive damages award, courts follow the three guideposts set forth by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996).  *See Jennings*, 18 F.4th at 390.  Those guideposts are the "(1) degree of reprehensibility of the defendant's conduct, (2) relationship of the punitive damages to the compensatory damages, and (3) criminal and civil penalties imposed by the state's law for the misconduct in question."  *Id.* (quoting *Payne*, 711 F.3d at 101).  Courts also compare the punitive damages award to those awarded in comparable cases.  *See Jennings*, 18 F.4th at 390; *Payne*, 711 F.3d at 104.

### A.       Degree of Reprehensibility

The first *Gore* factor is "[p]erhaps the most important indicium of the reasonableness of a

punitive damages award."  *Gore*, 517 U.S. at 575.  "Punitive damages are intended to punish,

and the severity of punishment, as in the case of criminal punishments, should vary with the

degree of reprehensibility of the conduct being punished."  *Payne*, 711 F.3d at 101.  There are

certain "aggravating factors" that are "associated with particularly reprehensible conduct,"

including "whether a defendant's conduct was violent or presented a threat of violence" and

"whether a defendant acted with deceit or malice as opposed to acting with mere negligence."

*Lee*, 101 F.3d at 809; *see Jennings*, 18 F.4th at 390.

Here, the evidence at trial, viewed in the light most favorable to plaintiff,[10] supports a

finding that defendants engaged in reprehensible conduct.  "[A] law enforcement officer's

'abuse[] of a position of respect and authority to commit malicious . . . acts of violence,' as the

jury found to have happened here, is 'reprehensible' and constitutes the sort of misconduct that

punitive damages awards serve to deter."  *Magalios*, 2022 WL 407403, at *3 (quoting *DiSorbo*,

343 F.3d at 188); *see Anderson v. Aparicio*, 25 F. Supp. 3d 303, 311 (E.D.N.Y. 2014) (finding

reprehensible, "a disturbing demonstration of unprovoked violence by a law enforcement

officer"), *aff'd sub nom., Anderson v. Cnty. of Suffolk*, 621 F. App'x. 54 (2d Cir. 2015).

Here, the jury found that defendants used excessive force against plaintiff.  Plaintiff

testified that defendants, punched, kicked, stomped on and choked him, without justification,

after Cardoza ordered plaintiff into the vestibule, for the purpose of avoiding the view of cameras

in the housing area (according to plaintiff's theory of the case).  Indeed, the video shows plaintiff

---

[10] *Humphrey v. Crea*, 822 F. App'x 36, 37 (2d Cir. 2020); *Anderson v. Cnty. of Suffolk*, 621 F.
App'x 54, 55 (2d Cir. 2015); *Payne*, 711 F.3d at 87, 98 n.10.

being punched and kicked while a group of inmates watched from a nearby window.  Although

Nervil argues that he merely came to help Cardoza (*see* Nervil Mem. at 14), the video shows

Nervil gratuitously wind up to punch and kick plaintiff, as well as stomp on him, while he was

on the ground.  In this Court's view, "[t]his was not an act of mere negligence; it was an assault

intended to cause plaintiff physical and emotional harm." *Anderson*, 2020 WL 6151249, at *8

(internal quotation marks and citation omitted).  Plaintiff testified, and the photographs

corroborated, that he suffered significant contusions, lacerations and bruising to his face, nose,

ears, and torso, as a result of the assault.  The fact that the jury awarded considerable

compensatory damages demonstrates that they accepted most, if not all, of plaintiff's proffered

evidence concerning the nature of plaintiff's injuries.  Moreover, the jury heard and was entitled

to consider the inaccurate, or false, use of force reports created by each defendant officer, shortly

after the incident.  *See Gore*, 517 U.S. at 579 (court may consider evidence of "deliberate false

statements, acts of affirmative misconduct, or concealment of evidence of improper motive");

*Jennings*, 18 F.4th at 391 ("The reprehensible nature of the officers' conduct is underscored by

the elaborate steps they took to cover up their misconduct.").

### B.      Relationship Between Harm and Punitive Damages Award

With respect to the second guidepost, "courts must ensure that the measure of punishment

is both reasonable and proportionate to the amount of harm to the plaintiff and to the general

damages recovered." *Magalios*, 2022 WL 407403, at *4 (quoting *State Farm Mut. Auto. Ins. Co.

v. Campbell*, 538 U.S. 408, 426 (2003)).  "Courts often consider the ratio of the punitive

damages award to the compensatory award, and consider whether that ratio is reasonable in the

circumstances of the case." *Magalios*, 2022 WL 407403, at *4 (quoting *Thomas*, 903 F. Supp.

2d at 267).  On the other hand, there is no "simple mathematical formula, as there may be cases

where a particularly egregious act has resulted in only a small amount of economic damages."
*Jennings*, 18 F.4th at 391 (quoting *DiSorbo*, 343 F.3d at 187).

Here, the ratio between the punitive damages award of $1,000,000 and the remitted
compensatory damages award of $250,000 is four to one, and therefore does not raise
constitutional concerns.  *See Gore*, 517 U.S. at 581 (noting that "even though a punitive damages
award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,'
it did not 'cross the line into the area of constitutional impropriety'"); *Jennings*, 18 F.4th at 392
("we see nothing untoward about the 1:4 ratio between compensatory and punitive damages");
*Rizk v. Mehirdel*, No. 14-CV-6434, 2022 WL 5184709, at *8 (E.D.N.Y. Oct. 5, 2022) (approving
punitive damages award of approximately five times plaintiff's compensatory damages);
*Anderson*, 2020 WL 6151249, at *8 (7.67 to 1 ratio did not "shock the judicial conscience").

### C.  Sanctions for Comparable Conduct

The Second Circuit has found that "[w]here a jury imposes punitive damages for a
violation of § 1983, the penalties imposed under federal criminal law offer a useful comparison."
*Jennings*, 18 F.4th at 393.[11]  Under 18 U.S.C. § 242,[12] federal criminal civil rights violations
warrant a fine of up to $250,000 and up to ten years in prison.  *See* 18 U.S.C. §§ 242, 3571(b)(3).
The existence of the federal civil rights statute puts the officers "on notice that abuse of power

---

[11] In contrast, the Second Circuit has found that misdemeanor penalties under state law are of
limited value in excessive force cases.  *See DiSorbo*, 343 F.3d at 188 ("[C]riminal penalties
understate the notice when the misconduct is committed by a police officer."); *Payne*, 711 F.3d
at 104 (misdemeanor classification "tells very little about whether the particular award was
excessive").

[12] Section 242 provides that "[w]hoever, under color of any law . . . subjects any person . . . to
the deprivation of any rights, privileges, or immunities secured or protected by the Constitution
or laws of the United States . . . and if bodily injury results from the acts committed in violation
of this section . . . shall be fined under the title or imprisoned not more than ten years, or both
. . . ."  18 U.S.C. § 242.

could lead to a term of imprisonment as well as to a substantial fine." *Jennings*, 18 F.4th at 393. Moreover, "training as a [correction] officer [gives an officer] notice as to the gravity of misconduct under color of [his or her] official authority, as well as notice that such misconduct could hinder [his or her] career." *Id.* (quoting *Lee*, 101 F.3d at 811).

Here, since the punitive damages award of $500,000 against each defendant exceeds the maximum fine under the federal civil rights statute, this comparison weighs in favor of finding the punitive damages award excessive. *See Magalios*, 2022 WL 407403, at *5 (reducing punitive damages awards that exceeded $250,000 for more culpable defendants); *see also Saleh*, 2022 WL 4078150, at *29 (Title VII and NYSHRL statutory damages cap is "an important consideration" and weighs in favor of reducing punitive damages award).

### D.    Comparable Excessive Force Cases

In addition to consideration of the *Gore* factors, the court must compare the punitive damages award with awards for excessive force in similar cases. *See Jennings*, 18 F.4th at 393-94; *DiSorbo*, 343 F.3d at 188; *Mathie*, 121 F.3d at 817. Comparable cases where the damages have been remitted serve as "the upper end . . . of the appropriate punitive damages range for the conduct at issue." *Poulos*, 2018 WL 3750508, at *8 n.7. As one court recently observed, "[c]ourts within this circuit have upheld a wide range of punitive damage awards for cases of excessive force." *Magalios*, 2022 WL 407403, at *6 (citing cases).

As discussed above, the facts in *Jennings* are comparable to those at issue here. At the first trial in *Jennings*, the jury awarded $1,000,000 in punitive damages against the primarily responsible officer and $750,000 each against the two less culpable officers, for a total award of $2.5 million. *See* 2018 WL 5630454, at *1. After defendants moved for a new trial or remittitur of damages, the court ordered a new trial unless plaintiff accepted, *inter alia*, a punitive damages

36

award of $120,000 against the primary defendant and $10,000 each against the other two

officers.  *See* 2018 WL 5630454, at *19.  However, plaintiff rejected the remittitur option and

opted for a new trial.  At the second trial, the jury awarded punitive damages of $250,000 against

the primary officer, $75,000 against a second officer, and $30,000 against the third officer, for a

total of $355,000.  *See* 2019 WL 6253813, at *5.  Defendants again moved for remittitur, but the

district court denied the motion.  On appeal, the Second Circuit affirmed the district court's

decision finding the punitive damages award within the range of similar punitive damages

awards.  *See* 18 F.4th at 393-94.

　　　　In *Anderson*, discussed above, the jury found that four corrections officers "used

excessive force to violently beat and subdue plaintiff" in retaliation for talking to an investigator

about an officer's misconduct.  *See* 2020 WL 6151249, at *8.  The court found that the jury

"concluded plaintiff was punched, stomped, and beaten without provocation" and that defendants

"lied to cover up their use of unprovoked, excessive force against plaintiff, an inmate in their

charge."  *Id*.  The court found the total punitive damages award of $575,000 reasonable against

the four correction officers in amounts ranging from $50,000 to $275,000.  *See id.* at *9.

　　　　In *Magalios*, the plaintiff inmate testified that the defendant correction officers targeted

him without justification; that they removed any potential witnesses from the room in advance of

the assault on him; and that one officer held him down while another officer (and others he could

not identify) kicked and punched him for approximately 30 to 60 seconds while others looked on

and did nothing.  *See* 2022 WL 407403, at *3.  Plaintiff and other witnesses testified about the

significant bruising and marks on the plaintiff's back, including a mark in the shape of a boot

print, as well as abrasions and lacerations on his knees.  *See id.*  The defendant officers also

created false reports and gave false testimony that denied using any force against the plaintiff.

*See id.* at *4.  The jury awarded compensatory damages of $50,000, and a total punitive damages award of $950,000 against three officers, in amounts ranging from $250,000 to $350,000 per officer.  *See id.* at *1.  On defendants' motion for remittitur, the court found that the jury's award was "somewhat excessive," but that the circumstances "mandate[] a significant punitive damages award to deter the Defendants, and others like them, from engaging in similar acts in the future." *Id.* at *6.  The court found that a total punitive damages amount of $500,000 was appropriate -- and in line with the court's decision in *Anderson* -- and set the individual punitive damages awards at $200,000 each for two of the officers who assaulted plaintiff, and $100,000 for the third officer, who failed to intervene.  *Id.* at *7.

The Court will also briefly examine several Second Circuit decisions addressing punitive damages awards in excessive force cases.  In *Payne*, the officer punched a handcuffed plaintiff in the face and neck seven to ten times and kneed him in the back several times, while arresting him pursuant to the state's mental health law.  *See* 711 F.3d at 88.  The jury awarded $300,000 ($401,597.91, adjusting for inflation) in punitive damages.  *See id.* at 90.  Recognizing that the plaintiff had provoked the officer by making violent threats and kicking him in the groin, the Second Circuit remanded for a new trial unless the plaintiff agreed to a reduced punitive damages award of $100,000 ($133,865.97, adjusting for inflation).  *See id.* at 101, 106.  The Second Circuit observed that "[it has] never approved a punitive damage award against an individual police officer as large as the $300,000 award."  *Id.* at 105.

In *O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988), the Second Circuit sustained a punitive damages award against two police officers totaling $185,000 (approximately $462,274.55, adjusting for inflation), where the plaintiff "while handcuffed and unable to defend himself, was struck repeatedly about the head" with a blackjack.  *See id*. at 10, 13-14.  The

38

officers also dragged plaintiff across the floor by the throat.  *See id.* at 10, 11.  Plaintiff suffered a fractured nose and lacerations on his forehead as a result of the defendants' conduct.  *See id.* at 10.

In *Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990), a police officer struck plaintiff in the back of the head after an argument over a parking ticket.  *See id*. at 185.  Plaintiff briefly lost consciousness and awoke to the officer pressing a gun to his head and a knee into his back.  *See id.*  As a result, plaintiff suffered two displaced vertebrae, a cracked rib and serious head trauma.  *See id.*  Although the trial court found the punitive damages award of $150,000 (approximately $354,589.94, adjusting for inflation) against the police officer excessive, the Second Circuit reversed the district court and reinstated the damages award.  *See id.* at 187.

Finally, in *King v. Marci*, 993 F.2d 294 (2d Cir. 1993), state court security officers punched plaintiff repeatedly, including when he was on the ground, and used a chokehold while in the course of the arrest.  *See id.* at 296.  The court reduced the jury's award of punitive damages from $175,000 to $100,000 ($206,949.89, adjusted for inflation) against one officer[13] and from $75,000 to $50,000 ($103,474.95, adjusted for inflation) against the other officer.

Based on the analysis of the comparable cases, discussed above, this Court finds that the total punitive damages award of $1 million in this case ($500,000 against each defendant) is excessive.  Accordingly, a remittitur of the punitive damages awards to **$250,000** for each defendant is appropriate as the maximum punitive damages award a reasonable jury could have imposed on each defendant (for a total punitive damages award of **$500,000**).  This award is within the range of the total punitive damages awards and individual punitive damages awards in

---

[13] The punitive damages award included damages for false arrest and malicious prosecution, in addition to excessive force.  *See id.* at 298.

the similar cases discussed above.  Moreover, based on the remitted compensatory damages, the ratio of punitive damages to compensatory damages is 2:1.  Such an award is also consistent with the maximum fine imposed under federal law for comparable conduct.  In this Court's view, the reduced punitive damages award is sufficient to deter other correction officers from engaging in similar conduct in the future, but is not excessive.

### Conclusion

For the reasons set forth above, the Court grants defendants' motions for remittitur. Because the Court finds the compensatory and punitive damages awards excessive, the Court grants a new trial on the issue of damages only, unless plaintiff accepts a remittitur of the compensatory damages awarded from $250,000 against each defendant to **$125,000** per defendant, and the punitive damages awarded from $500,000 against each defendant to **$250,000** per defendant for a total award of **$750,000** (*i.e.,* $250,000 in total compensatory damages and $500,000 in total punitive damages).

By **April 20, 2023,** plaintiff's counsel shall file via ECF written notice of whether plaintiff will accept the remitted awards.  If plaintiff elects to have a new trial on damages, the Court will schedule a conference to set a new trial date.

**SO ORDERED**

Dated: Brooklyn, New York
       March 30, 2023

                                        s/ James R. Cho
                                        James R. Cho
                                        United States Magistrate Judge

40